*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATASHA THOMAS; SUSAN GIBBS; EDWINA LEWIS,
*Plaintiffs-Appellants,*

v.

ANN COHEN; GLENN CRAIG; JAMES EMBRY; SUSAN
HARBOUR, in their individual capacities,
*Defendants-Appellees.*

No. 05-5072

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00719—Charles R. Simpson III, District Judge.

Argued: January 31, 2006

Decided and Filed: March 31, 2006[*]

Before: RYAN, CLAY, and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** David A. Friedman, FERNANDEZ FRIEDMAN GROSSMAN KOHN ELLC,
Louisville, Kentucky, for Appellants. Paul V. Guagliardo, JEFFERSON COUNTY ATTORNEY'S
OFFICE, Louisville, Kentucky, for Appellees. **ON BRIEF:** David A. Friedman, FERNANDEZ
FRIEDMAN GROSSMAN KOHN ELLC, Louisville, Kentucky, for Appellants. Paul V.
Guagliardo, Gregory S. Gowen, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville,
Kentucky, for Appellees.

RYAN, J., delivered the opinion of the court, in which GILMAN, J., joined. CLAY, J. (pp.
7-11), delivered a separate dissenting opinion.

---

## OPINION

---

RYAN, Circuit Judge. The district court granted summary judgment in favor of the
defendant police officers in this 42 U.S.C. § 1983 civil rights action in which the plaintiffs allege
that their constitutional rights were violated when the officers evicted them from a transitional

---

[*] This decision was originally issued as an "unpublished decision" filed on March 31, 2006. The court has now
designated the opinion as one recommended for full-text publication.

homeless shelter.  We **AFFIRM** because the court properly concluded that, under Kentucky law, the plaintiffs lacked a protected property interest in the premises.

## I.

On December 8, 1998, the defendants, all officers of the Louisville, Kentucky, police department, removed the plaintiffs, Natasha Thomas, Susan Gibbs, and Edwina Lewis, from Augusta House, a transitional shelter in which the women were residing.  They did so at the request of the director of the shelter and without affording the plaintiffs legal process of any kind.  The director had earlier asked the plaintiffs to leave the shelter for various violations of house rules, but they refused to leave.

At the time of the eviction, Augusta House was owned and operated by Mission House, Inc.  The residence was the least restrictive stage of a three-stage transitional shelter program operated to help homeless women become financially independent members of mainstream society.  There is no evidence in the record to support the dissent's characterization of Augusta House as low-income housing rather than a transitional homeless shelter, and the plaintiffs themselves presented no proof that Augusta House was not a shelter.

All Augusta House residents were homeless women with financial difficulties who had progressed through the first two stages of the Mission House program.  Emmaus House was the first stage of the program.  Participants resided there for approximately two months until Mission House staff determined they were ready to advance to the next stage, the Annex.  Emmaus House residents were subject to a curfew and rules governing a wide range of conduct, and Mission House staff provided constant supervision.  The staff requested that each participant pay a $140 monthly shelter fee and assigned each participant a sleeping area and chores.  In addition to providing shelter in a structured environment, Mission House offered Bible study opportunities and assisted program participants in obtaining social security benefits, food stamps, and employment.

As the women progressed through the program, Mission House gave them greater responsibility in order to ease their transition into mainstream society.  The staff continued to assign each participant a sleeping area and chores, but the women were subject to fewer rules and received less supervision.  When the women reached Augusta House, they were no longer subject to a curfew or live-in supervision.  They were expected to have employment or income of some kind prior to moving into Augusta House, but the shelter fee arrangement remained unchanged.  The women resided at Augusta house until "they g[o]t on their feet," which could take up to a couple of years, and, with the help of the Mission House staff, they found permanent housing.

Augusta House was located in a house in a residential neighborhood in order to provide the residents with the responsibility of maintaining a house before their transition into mainstream society.  At the time of the eviction, each plaintiff was the sole occupant of her bedroom, and the plaintiffs shared the common living areas, bathroom, and kitchen with other occupants of the house.  The residents were given keys to the house, and they were able to come and go freely, subject to the house rules.  There was no lease between the plaintiffs and Mission House or Augusta House, and staff members were authorized to enter the bedrooms in Augusta House, move the residents to different bedrooms, and place two residents in a bedroom if they wished to do so.

In the fall of 1998, a dispute arose between the plaintiffs and the director of Augusta House, Laura Zinious, over the plaintiffs' alleged violation of house rules.  After allegedly asking the residents to leave, as was standard practice when residents violated house rules, Zinious called the police to have the plaintiffs evicted.  The responding officers evicted the plaintiffs over their protests that they were tenants who paid rent and despite their attempts to show the officers documents from their legal aid attorney expressing an opinion as to their tenancy.

The plaintiffs filed a complaint under 42 U.S.C. § 1983 alleging that the eviction violated their civil rights protected by the Fourth and Fourteenth Amendments to the United States Constitution. The officers moved for summary judgment, stipulating, for purposes of the motion, that the plaintiffs were tenants of Augusta House at the time of the eviction, but claiming the officers' actions were protected from suit based on qualified immunity. The court denied the motion, and the officers appealed.

A divided panel of this court concluded that the officers were entitled to qualified immunity with respect to the Fourth Amendment claim, but that the officers were not entitled to qualified immunity with respect to the Fourteenth Amendment claim. *See Thomas v. Cohen*, 304 F.3d 563, 565-66 (6th Cir. 2002).

On remand, the defendants again moved for summary judgment, this time arguing that the plaintiffs' living arrangements were not governed by the Kentucky Uniform Residential Landlord and Tenant Act (KURLTA) and that the plaintiffs, therefore, did not have a recognized property interest under Kentucky state law. The district court granted the defendants' motion and the plaintiffs now appeal.

## II.

"We review a grant or denial of summary judgment *de novo*, using the same Rule 56(c) standard as the district court." *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In deciding upon a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).

## III.

The district court found that no material facts were in dispute and that the plaintiffs did not have a protected property interest under Kentucky law because the KURLTA expressly provides that it does not apply to "[r]esidence at an institution, public or private, if incidental to detention or the provision of medical, geriatric, educational counseling, religious, or similar service." KY. REV. STAT. ANN. § 383.535(1). The KURLTA does not define the term "institution," and we find no Kentucky authority applying the KURLTA's "institution exception." The plaintiffs argue that Augusta House is not an institution because it is located in a residential building and neighborhood, but we reject that argument, and, as we will explain, we agree with the district court that, as a matter of law, the plaintiffs' residence at Augusta House was incidental to the provision of "educational counseling, religious, or similar service[s]."

Although Kentucky courts have not interpreted the "institution exception" to the KURLTA, Kentucky's general rule of statutory interpretation is that, in the absence of ambiguity, the words in a statute are given their plain and ordinarily understood meaning, unless such an application would lead to an absurd result. *See Autozone, Inc. v. Brewer*, 127 S.W.3d 653, 655 (Ky. 2004). As the dissent notes, courts have interpreted identical provisions of the Oregon and Washington versions of the URLTA. *See Burke v. Oxford House of Oregon Chapter V*, 103 P.3d 1184 (Or. Ct. App. 2004); *Sunrise Group Homes, Inc. v. Ferguson*, 777 P.2d 553 (Wash. Ct. App. 1989). Using a dictionary definition, these courts explained that "incidental 'does not mean that room and board must be trivial or unimportant in comparison with the overall institutional purpose; it means that living there is *subordinate or attendant* to the institutional purpose.'" *Burke*, 103 P.3d at 1193 (quoting *Sunrise*, 777 P.2d at 555). The courts in *Burke* and *Sunrise* also rejected the dissent's

argument that housing cannot be subordinate or attendant to an institution's provision of services when one of the institution's primary services is the provision of housing. *See id.* & n.9; *Sunrise*, 777 P.2d at 555.

The court in *Sunrise* affirmed the trial court's finding that a group home for the developmentally disabled was an institution, explaining:

> [T]he room and board provided by the Olivia Park facility is incidental to the receipt of services the facility was created to provide. Congregate care homes provide those who are unable to "maintain a safe environment in an independent living arrangement" with supervision and "assistance with activities of daily living and/or health-related services[.]"
>
> While congregate care facilities exist to keep developmentally disabled persons mainstreamed, and to that extent are an attempt at "deinstitutionalization," that is not to say they lack an institutional purpose above and beyond the provision of fundamental room and board services. The RLTA specifically excludes such institutional living arrangements from the scope of its provisions.

*Sunrise*, 777 P.2d at 555 (citation omitted).

Similarly, the court in *Burke* held that Oxford House, an unsupervised halfway house, is an institution under the Oregon Residential Landlord and Tenant Act. *Burke*, 103 P.3d at 1194. Oxford House was established to help "recovering drug and alcohol addicts make the transition to independent lives in an environment that allows them to continue their recovery process without professional supervision." *Id.* at 1185. The court explained:

> [T]he environment of self-policing and mutual support at Oxford House combines with the zero-tolerance principles to amount to services similar to counseling; that is, Oxford House provides peer supervision, support, and counseling. . . .
>
> . . . .
>
> . . . People seeking membership at Oxford House are looking to maintain their sobriety, establish themselves financially, and govern their own lives without the "overseer" that typically accompanies residence at a halfway house. The fact of residence is subordinate or attendant to those purposes.

*Id.* at 1191, 1193.

As in *Burke* and *Sunrise*, the provision of housing here was an integral part of the Mission House program, but it was incidental to Mission House's purpose of helping homeless women become financially independent members of mainstream society. The plaintiffs resided at Augusta House only as a result of their participation in the Mission House program. As the plaintiffs progressed through the program, Mission House provided them with various services to help them integrate themselves into mainstream society. In the early stages of the program, Mission House staff provided the plaintiffs assistance in obtaining social security benefits, food stamps, and employment, as well as a rigidly structured environment and constant supervision to help them get their lives back on track. As they progressed through the program to Augusta House, Mission House provided the plaintiffs with more responsibility and less structure in a home-like environment to help them learn how to achieve lasting financial independence upon leaving the program.

The "deinstitutionalized" home-like environment at Augusta House and its location in a residential neighborhood did not vitiate or in any way diminish the primary social services character

of the Mission House program; rather they provided a relatively comfortable and "realistic setting" in which Mission House could more effectively achieve its purpose of helping homeless women in the program learn how to achieve lasting financial independence. Mission House provided housing in Augusta House *only* to facilitate the provision of this counseling-like service; it did not provide housing to the general public who would not participate in, or benefit from, its primary social service program.

We conclude that the plaintiffs' residence at Augusta House was incidental to the "educational counseling, religious, or similar service[s]" Mission House provided in fulfilling its mission of helping homeless women become financially independent members of mainstream society. Therefore, the plaintiffs' residence at Augusta House was not governed by the KURLTA.

## IV.

In the alternative, we conclude that, even if the plaintiffs' residence at Augusta House did not fall under the KURLTA's "institution exception," the plaintiffs failed to qualify as tenants under the KURLTA because they have presented no evidence that they had a right to exclusive possession of Augusta House or their individual bedrooms. The district court also concluded that the plaintiffs did not qualify as "tenants" under Kentucky common law, but the plaintiffs do not address this issue on appeal and have therefore waived it. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 516-17 (6th Cir. 2002). The plaintiffs argue only that they were tenants under the KURLTA.

The KURLTA defines a tenant as "a person entitled under a rental agreement to occupy a dwelling unit to the exclusion of others." KY. REV. STAT. ANN. § 383.545(15). "'Rental agreement' means all agreements, written or oral, and valid rules and regulations adopted under KRS 383.610 embodying the terms and conditions concerning the use and occupancy of a dwelling unit and premises," *id.* § 383.545(11), and a "dwelling unit" is "a structure or the part of a structure that is used as a home, residence, or sleeping place by one (1) person who maintains a household or by two (2) or more persons who maintain a common household," *id.* § 383.545(3).

Contrary to the plaintiffs' claim, it is not clear whether each plaintiff's "dwelling unit" was Augusta House as a whole or her individual bedroom, but we need not answer that question because the plaintiffs have presented no evidence that they were "entitled under a rental agreement" to occupy Augusta House or their individual bedrooms "to the exclusion of others." They merely argue that each plaintiff had a key to Augusta House and sole possession of her bedroom at the time of eviction. In contrast, the defendants have provided evidence that Mission House had an unrestricted right to house others in Augusta House as well as a right to assign Augusta House residents to different bedrooms and place more than one resident in a bedroom.

We agree with our dissenting colleague and with the court in *Torbeck v. Chamberlain*, 910 P.2d 389, 392-93 (Or. Ct. App. 1996), that the phrase "to the exclusion of others," does not require that a party be entitled to exclude *all* others, including co-tenants, to be protected by the KURLTA. But the dissent, like the plaintiffs, confuses the plaintiffs' good fortune of exclusive possession with a right to exclusive possession. The fact that the plaintiffs had keys to Augusta House does not imply a right to exclusive possession when the landlord had a right to provide keys to whomever else it chose. Along similar lines, the fact that each plaintiff had her own bedroom, which, although its doors could not be locked, the other residents of Augusta House had no right to enter, provides no evidence of a right to exclusive possession.

Here, the plaintiffs have presented evidence only that they had the good fortune of exclusive possession of their bedrooms during their approximate two-month stay at Augusta House. The defendants presented evidence that Mission House could permit others to reside in Augusta House and could move the plaintiffs to different bedrooms or place other residents in their bedrooms at any

time, and the plaintiffs present no evidence to dispute that. And, contrary to the dissent's assertion, the record does not reflect that the Mission House staff had only a limited right to enter Augusta House. It merely reflects that the staff did not reside there in furtherance of Mission House's goal of helping the plaintiffs become financially independent members of mainstream society. Therefore, there is no factual dispute that the plaintiffs were not entitled to possess Augusta House or their individual bedrooms "to the exclusion of others," and they failed to qualify as tenants under the KURLTA as a matter of law.

## V.

We conclude that the plaintiffs lacked a protected property interest under Kentucky law because their residence at Augusta House constituted residence at an institution, which is not governed by the KURLTA, and, in the alternative, they failed to qualify as tenants under the KURLTA. We **AFFIRM** the district court's order granting summary judgment in favor of the defendants.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting. This case arises out of Plaintiffs' claim that Defendant Laura Zinious evicted them from Augusta House in retaliation for lodging a complaint with the Board of Health. Plaintiffs allege that the eviction violated their Fourteenth Amendment due process rights by depriving them of an opportunity to be heard prior to the eviction as required by Kentucky law. This Court previously denied Defendants qualified immunity on Plaintiffs' due process claim, holding that the Kentucky Uniform Residential Landlord Tenant Act ("KURLTA"), Ky. Rev. Stat. Ann. §383.505-383.705 (West 2005), provided the tenants at Augusta House with an interest protected by the Due Process Clause of the Fourteenth Amendment and that this right was clearly established. *Thomas v. Cohen*, 304 F.3d 563 (6th Cir. 2002). Defendants now claim that Plaintiffs are not entitled to due process because Plaintiffs are not tenants under KURLTA. Specifically, Defendants contend that Augusta House is a "transitional women's shelter," and thus excluded from KURLTA's coverage by § 383.535(1), which provides that KURLTA does not apply to living arrangements that are "incidental" to the provision of certain specified services. Additionally, Defendants contend that Plaintiffs are not "tenants" as that term is defined by KURLTA. Because I believe that Defendants cannot evade KURLTA's statutorily mandated eviction procedures simply by labeling Augusta House a "transitional shelter" and Plaintiffs' monthly rent a "shelter fee," I would reverse the order of the district court and remand for trial.

**I.**
**BACKGROUND**

Before delving into the legal arguments presented in this appeal, I find it necessary to briefly clarify the nature of the issue before this Court. The question this Court decides today is not, as the majority claims, whether residents of traditional shelters are "tenants" entitled to KURLTA's protections, but rather whether KURLTA permits landlords to deprive residents of low-income housing of statutorily mandated eviction procedures simply by labeling low-income housing a "shelter." Plaintiffs' residency at Augusta House was not transient; they lived at Augusta House for several months pursuant to a rental agreement and Defendant Zinious indicated that she anticipated Plaintiffs would reside at Augusta House for "a couple of years." (J.A. at 179.) Additionally, each Plaintiff paid $140 a month in exchange for his or her own room, which no other resident had the right to enter. Finally, no supervisory staff resided at Augusta House. Plaintiffs lived at Augusta House as independent adults.

This distinction is crucial to the instant appeal because residents at typical shelters clearly are not entitled to KURLTA's protections. As will be discussed later, typical shelter residents, unlike Plaintiffs, do not live at shelters pursuant to rental agreements. Defendants attempt to classify Augusta House as a shelter in order to escape compliance with Kentucky's statutory eviction procedures. The majority errs in accepting Defendants' characterization of Augusta House without analysis.

**II.**
**DISCUSSION**

Whether Plaintiffs are tenants under KURLTA presents a factual dispute that should not be resolved on summary judgment. As will be more fully explained below, Plaintiffs present sufficient evidence to allow a reasonable jury to conclude that their residency at Augusta House was not incidental to the provision of any services and thus that § 383.535(1) does not exclude Plaintiffs' living arrangement from KURLTA's coverage. Similarly, Plaintiffs present sufficient evidence to

allow a reasonable jury to conclude that they were "tenants" as that term is defined by KURLTA. Therefore, the district court erred in granting summary judgment in favor of Defendants.

## A.      Standard of Review

This case comes before us as an appeal of a district court's grant of summary judgment in favor of Defendants.  We review a district court's decision to grant summary judgment *de novo*. *Kalamazoo Acquisitions v. Westfield Ins. Co.,* 395 F.3d 338, 341 (6th Cir. 2005) (internal citations omitted).  Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "The district court, and this court in its review of the district court, must view the facts and any reasonable inferences drawn from them in the light most favorable to the party against whom judgment was entered*." Kalamazoo Acquisitions*, 395 F.3d at 342 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Neither this Court nor the district court may weigh the evidence or make credibility determinations. *Logan v. Denny's Inc.,* 259 F.3d 558, 570 (6th Cir. 2001).

## B.      Plaintiffs' Residency at Augusta House is Not Incidental to the Provision of Services

Section 383.535(1) of the Kentucky Revised Code does not exclude Plaintiffs' living arrangements from KURLTA's coverage. Section 383.535 provides that KURLTA shall not extend to "[r]esidence at an institution, public or private, if incidental to detention or the provision of medical, geriatric, educational counseling, religious, or similar services." Ky. Rev. Stat. Ann. § 383.535(1).  To fall within this exclusion, a residence must meet the following three criteria: (1) the residence must be at an institution; (2) the institution must provide medical, geriatric, educational counseling, religious, or similar services; and (3) the residence must be incidental to the provision of such services. *See id.* Although Plaintiffs' residency at Augusta House likely satisfies the first two criteria, Plaintiffs' residency is not incidental to the provision of services.  Therefore, § 383.535(1) does not exclude Plaintiffs from KURLTA's coverage.

Plaintiffs' residency at Augusta House was not "incidental" to any provision of services because Plaintiffs' landlord, Mission House, provided Plaintiffs with housing primarily to ensure that Plaintiffs were provided a place to live and not to further any other service provided by Mission House.  As the majority opinion recognizes, no Kentucky court has interpreted the term "incidental" in the context of § 383.535(1).  At least two other state courts, however, have interpreted identical provisions in their own landlord tenant acts.  These courts have recognized that a person's residency is "incidental" to the provision of services when it is "subordinate or attendant to the [relevant] institution['s] purpose." *See Sunrise Group Homes, Inc. v. Ferguson*, 777 P.2d 553, 555 (Wash. Ct. App. 1989); *see also Burke Oxford House of Oregon*, 103 P.3d 1184 (Or. Ct. App. 2004) (en banc) (citing *Sunrise*).  In this case, Mission House, the relevant institution, identifies its primary goal to be the provision of housing and shelter for the poor.  Because one of Mission House's primary goal is to provide housing, the provision of housing is not subordinate or attendant to Mission House's provision of other services.  Indeed, it is entirely possible that Mission House's other services are actually attendant to the goal of providing housing.

Even if the so-called transitional living services were not incidental to the housing provided at Augusta House, it does not follow that the housing at Augusta House is incidental to these services. *See Gray v. Pierce County Hous. Auth.*, 97 P.3d 26 (Wash. Ct. App. 2004) (holding that a housing authority's provision of housing to individuals with low income, bad credit, criminal history, and/or history of past evictions was not excluded from the protections of Washington's Landlord Tenant Act simply because the housing authority conditioned the residency on life skills classes).  The comment to § 1.202 of KURLTA makes clear that § 383.535(1) was intended to

exempt housing that facilitates the provision of some primary service. Uniform Residential Landlord Tenant Act, Nat'l Conference of Comm'r on State Laws, available at Rental Housing Online, http://www.rhol.org/rental/KURLTA.htm (last visited March 6, 2006). This is evidenced through the comment's list of housing that is incidental to the provision of services: prisons, nursing homes, hospitals and college dormitories. *Id.* In all of these examples, housing is provided to facilitate services that the relevant institution was created to provide. Prisons provide housing to segregate prisoners from the public at large. Nursing homes and hospitals provide attendant housing so that doctors and nurses are able to continuously care for the sick, elderly, and disabled. Colleges provides dormitories so that students can attend college classes. In contrast, Mission House's provision of residency at Augusta House does not facilitate Mission House's ability to provide any of the so-called "transitional living services." According to the majority these services include: (1) help obtaining food stamps and social security; (2) assistance in finding employment; and (3) Bible study classes. First, food stamps and social security can be obtained in a matter of hours. Plaintiffs' residency at Augusta House, however, was permanent. Thus, it seems clear that Plaintiffs' residency at Augusta House was intended to continue long after Plaintiffs obtained food stamps and social security. If Plaintiffs already had food stamps and social security, their continued residency at Augusta House could not facilitate Mission House's ability to help them obtain food stamps and social security. Similarly, Plaintiffs were required to have employment *prior* to living at Augusta House. Thus again, it would seem that Plaintiffs' residency at Augusta House could not have facilitated Mission House's ability to assist Plaintiffs in obtaining employment. Finally, the Bible study classes were optional. If Plaintiffs were not required to attend these classes, their residency at Augusta House could not be for the purpose of facilitating such attendance. Therefore, it seems fairly clear that Plaintiffs' residency at Augusta House was not intended to facilitate Mission House's provision of transitional services and that Defendants are simply seeking away to avoid following KURLTA's eviction procedures.

The majority erroneously characterizes *Burke* and *Sunrise* as having rejected my position. This is simply not the case. *Burke* and *Sunrise* rejected the position that housing was not incidental to the provision of services simply because housing was an important service. *Burke*, 103 P.3d at n.9; *Sunrise*, 777 P.2d at 289. In this case, however, the issue is not simply that housing is an important service but that housing is the primary goal. Because providing housing is the primary goal, the provision of housing cannot be incidental to any other service. This distinction is important because in some cases, as in *Burke*, housing may be an important service without being a primary goal. As the *Burke* court explained that while housing was "central" it was nonetheless "incidental" because it existed to facilitate the institution's sole purpose – assisting drug addicts with recovery. *Burke*, 103 P.3d at n.9. In other words, the housing was a means to an end. *Id.* In the instant case, housing is not being provided to further any service or goal. In contrast to *Burke*, where the housing facilitated a peer counseling system for recovering drug addicts, or *Sunrise*, where the housing facilitated the defendants' provision of medical services, Plaintiffs' residency at Augusta House did not facilitate the provision of any services. *Id.* at 1192; *Sunrise*, 777 P.2d at 289. This is made clear by the majority's complete inability to point to any specific service that Mission House provided to Plaintiffs' *at the time of their residency at Augusta House*, let alone any service facilitated by the residency.

## C.      Plaintiffs Are "Tenants" as Defined by KURLTA

Similarly, Plaintiffs provide sufficient evidence to allow a reasonable juror to find that Plaintiffs are tenants within the meaning of KURLTA. KURLTA defines tenant as "a person entitled under a rental agreement to occupy a dwelling unit to the exclusion of others." Ky. Rev. Stat. Ann. § 383.545(15). The record demonstrates that Plaintiffs lived in Augusta House pursuant to a rental agreement, which arguably granted them the right to live in Augusta House to the exclusion of others. Therefore, a jury should be allowed to determine whether Plaintiffs are tenants within the meaning of KURLTA.

### 1.      Rental Agreement

It is fairly obvious that Plaintiffs and Zinious entered into an oral rental agreement, which allowed Plaintiffs to occupy Augusta House.  Section 383.545(11) defines rental agreement as "all agreements, written or oral, . . . embodying the terms and conditions concerning the use and occupancy of a dwelling unit and premises." Ky. Rev. Stat. Ann. § 383.545(11).  In this case, Plaintiffs allege that they had an oral agreement with Mission House to use and occupy Augusta House.  Plaintiffs support these allegations with evidence, namely, Plaintiffs' residency at Augusta House prior to the eviction and Plaintiffs' payment of rent to Mission House.  Moreover, Laura Zinious, the manager of Augusta House, admits that she had an oral agreement with Plaintiffs permitting them to use and occupy Augusta House.  Therefore, Defendants' assertion that no rental agreement existed is unsupported both by Kentucky law and the record.

Defendants argue that a rental agreement does not exist because Mission House did not believe that it was entering into a rental agreement and Plaintiffs' "unilateral expectation" is insufficient to create a contract or agreement.  This argument runs contrary to the facts.  Zinious admits that she agreed to allow Plaintiffs' to use and occupy Augusta House.  Moreover, whether Zinious considered the agreement to constitute a "rental agreement" misses the point.  Whether the operative terms and understandings between the parties to the agreement constituted a rental agreement under the applicable law involves a legal determination.  Factually, in the instant case, Zinious admitted the agreement embodied certain terms, which rendered it a rental agreement under Kentucky law.

### 2.      Exclusion of Others

Next, Plaintiffs provide sufficient evidence to allow a reasonable juror to conclude that the rental agreement granted them the right to occupy Augusta House to the exclusion of others.  No Kentucky court has defined the phrase "to the exclusion of others" in the context of KURLTA.  However, the Oregon Court of Appeals has interpreted "to the exclusion of others" in an identical provision of its landlord tenant act. *Tobeck v. Chamberlain*, 910 P.2d 389 (Or. Ct. App. 1996).  The Oregon Court of Appeals held that exclusion of others means the exclusion of the public at large and not the exclusion of other tenants, or in some cases, even the landlord. *Id.* at 392-93.  Several considerations render the Oregon court's interpretation persuasive. First, KURLTA instructs courts to apply its provisions liberally to improve the quality of housing. Ky. Rev. Stat. Ann. § 383.505.  Thus, "tenant" should be interpreted broadly to expand KURLTA's coverage, not to exclude living arrangements from KURLTA's protections.  Second, the Oregon court's interpretation is in accord with the common law.  At common law, a tenancy was defined as the right to occupy a premises to the exclusion of others, including the landlord. *See Richmond v. Standard Elkhorn Coal Co.*, 300 S.W. 359, 360 (Ky. 1927).   Nonetheless, common law courts have recognized exceptions to a tenant's ability to exclude others. *Id.*  For example, in Kentucky, common law courts have upheld the existence of a tenancy despite a landlord's contractual right to enter the premises for limited purposes. *See id.*  Third, tenant is defined as a person with the right to exclude others, not necessarily the right to exclude *all* others.

In this case, Plaintiffs have offered evidence that they had the right to exclude the public from Augusta House.  Plaintiffs each had keys to the house.  Plaintiffs' possession of their own keys to the premises evidences their ability to lock the members of the public out of Augusta House and quintessentially symbolizes their right to exclude others.  Additionally, each Plaintiff occupied her own room and had the right to exclude other residents from her space.  Finally, the record indicates that Zinious and Mission House staff had only limited rights to enter Augusta House, as opposed to a general occupancy right.  That is, they could enter to enforce house rules but did not have a have the right to live at Augusta House.  Therefore, whether the rental agreement granted Plaintiffs the

right to occupy Augusta House to the exclusion of others, at the very least, constitutes an issue for the jury.

In summary, Plaintiffs have offered sufficient evidence to allow a reasonable juror to find both that § 383.535(1) does not render KURLTA inapplicable to Plaintiffs' residency at Augusta House and that Plaintiffs are tenants within the meaning of KURLTA. Thus, KURLTA may have granted Plaintiffs a protected property interest and summary judgment in Defendants' favor was improper.

## III.
## CONCLUSION

For the foregoing reasons, I would reverse the order of the district court and remand for trial.